563 So.2d 1305 (1990)
John J. FABACHER, Plaintiff-Appellant,
v.
LABORDE, McCAULEY & WILSON, ANESTHESIOLOGISTS (Cliffe C. Laborde, Jr., M.D.; C.B. McCauley, M.D.; and E.A. Wilson, M.D.), and St. Paul Fire & Marine Insurance Company, Defendants-Appellees.
No. 89-149.
Court of Appeal of Louisiana, Third Circuit.
June 27, 1990.
*1306 Reuvan Rougeau, Lake Charles, for plaintiff-appellant.
M. Keith Prudhomme, Lake Charles, for defendants-appellees.
Before DOMENGEAUX, C.J., and GUIDRY and KNOLL, JJ.
DOMENGEAUX, Chief Judge.
John J. Fabacher filed this medical malpractice suit against Lake Charles Anesthesiology Group[1] and its insurer, St. Paul Fire & Marine Insurance Co., seeking damages for the alleged negligence of Bobby Phillips, an employee or agent of the anesthesiology group. After a jury trial, judgment was rendered in defendants' favor and plaintiff's suit was dismissed. Plaintiff's motion for new trial was denied. Plaintiff now appeals, assigning as error the trial court's failure to instruct the jury on the doctrine of res ipsa loquitur and on the question of jury misconduct.

FACTS
On September 21, 1985, John Fabacher was brought to St. Patrick's Hospital with acute abdominal pain. After ten days of hospitalization, including four days in ICU, Fabacher was scheduled for gallbladder surgery on October 1, 1985. The surgeon obtained the services of the Lake Charles Anesthesiology Group, and Bobby Phillips was assigned as the certified registered nurse anesthetist (CRNA) who would administer anesthesia to Fabacher through an IV.
On the morning of surgery, Fabacher was brought from his hospital room to the holding area outside the operating room. He was in a "pre-medicated" or sedated state. There, Nurse Phillips attempted to insert an IV into Fabacher's left arm for the administration of anesthesia and other fluids. Fabacher testified at trial that Nurse Phillips stuck the needle into his left arm "around the elbow." Nurse Phillips demonstrated the location of the puncture for the jury, but this demonstration was not verbally or photographically preserved for the record. However, by deposition, Nurse Phillips testified that he inserted the needle "three inches above the elbow on the medial aspect of the forearm."
Because Nurse Phillips did not penetrate a vein upon initial insertion, he partially withdrew the needle and redirected it in search of the vein. Nurse Phillips withdrew the needle completely when Fabacher complained of pain and successfully started the IV in Fabacher's right wrist. The surgery proceeded without complication.
On October 2, 1985, Fabacher complained of numbness and tingling in his left little finger and half of his ring finger. This complaint was made to Dr. Michael Traub, Fabacher's family physician who assisted at the surgery. Fabacher told Dr. Traub that he felt a tingling sensation that caused him to jump back when the IV needle was *1307 inserted into his left forearm prior to surgery. Dr. Traub characterized the problem as discomfort in the ulnar nerve distribution and requested that Nurse Phillips see the patient because of a possible relation between the IV and the ulnar nerve discomfort.
Nurse Phillips saw Fabacher on October 7, 1985, and noted in the medical record that the patient had an incomplete ulnar nerve block which was inconsistent with the IV site and positioning for surgery. Nurse Phillips believed the problem would resolve itself within a few weeks.
Fabacher's symptoms persisted after he was discharged from the hospital, and Dr. Traub referred him to a neurologist, Dr. Fayez Shamieh. On October 18, 1985, Dr. Shamieh performed a nerve conduction study which revealed an ulnar nerve lesion at the level of the elbow. Because of Fabacher's continued complaints, Dr. Shamieh was asked to perform two subsequent nerve conduction studies, one in November 1986 and the other in April 1987. The results of both studies were within normal limits and Dr. Shamieh was unable to explain Fabacher's continued complaints of pain.

CAUSATION
All of the medical witnesses testified as to the possible causes of ulnar nerve palsy. Dr. Traub, the assisting surgeon, testified that the ulnar nerve is located deep in the forearm under a group of muscles; however, it is superficial at the elbow as it passes through the ulnar groove. Dr. Traub surmised that the IV needle must have come into contact with the ulnar nerve resulting in a compressive type injury that would resolve in two to three months. According to Dr. Traub, this could have occurred without negligence on the part of Nurse Phillips if Fabacher's ulnar nerve is not in the normal anatomical position, i.e. if it runs superficially in the forearm. However, the same injury could have occurred if Nurse Phillips inserted the IV into the ulnar groove, which would be an inappropriate or negligent act. We note that there is nothing in the medical record to indicate Nurse Phillips stuck Fabacher in the ulnar groove.
Nurse Phillips testified that ulnar nerve palsy can result from the negligent insertion of an IV needle either at the ulnar groove or deep into the forearm, rather than a superficial prick into the meaty portion of the forearm. Again, we note there is nothing in the medical record to indicate that Nurse Phillips stuck Fabacher in the ulnar groove or deep in the forearm.
Dr. Shamieh, the neurologist who performed the nerve conduction studies, agreed that ulnar nerve palsy can be caused by an IV puncture of the nerve at the ulnar groove or deep into the forearm. The condition can also be the result of chronic aggravation of the nerve such as the repetition of certain arm movements. Dr. Shamieh stated that if the IV was inserted superficially in the meaty portion of the forearm, then the IV needle was probably not the cause of Fabacher's ulnar nerve palsy. He did believe the palsy was caused by some type of trauma, but he was unable to narrow this down to a specific incident or series of events. Given Fabacher's normal nerve conduction studies in 1986 and 1987, Dr. Shamieh was unable to explain his long lasting subjective complaints of pain.
Dr. Robert Dale Bernauer, an orthopedic surgeon, examined Fabacher in January of 1987 and diagnosed partial ulnar nerve palsy. After reviewing his medical records, Dr. Bernauer felt the condition was resolving itself and did not require any treatment. Because of Fabacher's continuing complaints, Dr. Bernauer conducted more tests which showed normal nerve functioning.
Dr. Bernauer testified that the most common causes of ulnar nerve palsy are occupational conditions which exist over a period of years. Direct trauma and stretching can also cause the condition. Concerning *1308 Nurse Phillips' conduct, Dr. Bernauer described the difficulty in penetrating the ulnar nerve in the meaty portion of the forearm. "I don't see how you could get a needle into it," he surmised. He also saw no reason for an IV needle to be inserted in the ulnar groove. Dr. Bernauer testified that the most likely cause of Fabacher's problem, if he had no symptoms prior to surgery, was the position of the arm during surgery which could have put some pressure or stretch on the ulnar nerve.
Dr. James Eddy testified for the defendants as an expert anesthesiologist. He agreed with Dr. Bernauer that a CRNA would have no reason to insert an IV needle in the ulnar groove because there are no veins there. Furthermore, if Fabacher had an anatomically misplaced ulnar nerve that was superficial in the forearm, something Dr. Eddy has never heard of, a CRNA would have no way of knowing that and would therefore not be negligent if he hit it.
The medical evidence presented by the plaintiff failed to establish the precise cause of Fabacher's ulnar nerve palsy and the jury found defendants not "guilty of any professional negligence."

JURY INSTRUCTIONS
Fabacher contends that the trial judge erred in failing to instruct the jury on the doctrine of res ipsa loquitur. The record indicates that Fabacher's counsel may have offered the trial judge three special jury charges on res ipsa loquitur; however, no such charges were filed into the record in accordance with La.C.C.P. art. 1793. After instructing the jury, the trial court announced it would entertain any objections either party may have to the instructions. The following discourse took place:
MR. ROUGEAU: Your Honor, for the record on behalf of the plaintiff, John F. Fabacher, we would respectively object to the exclusion of the jury requests that were made, which includes Nos. 1, 2 and 3 of those submitted.
THE COURT: I believe you said jury requests, it would be
MR. ROUGEAU: The plaintiff's jury charges.
THE COURT: The Court will note that for the record. Do you have any objections?
MR. PRUDHOMME: No objections.
The right of a party to assign as error a trial court's failure to grant requested instructions is controlled by La.C.C.P. art. 1793 which requires the objecting party to state for the record the grounds of his objection. Failure to comply with the requirements of art. 1793 usually results in forfeiture of the right to appeal the instructions given. However, in this instance, we believe the trial court did in fact deny certain requested jury charges and Fabacher did object in response to the trial court's invitation at the appropriate time. We will therefore consider the issue before us. See Mitchell v. Fire & Casualty Insurance Co., 540 So.2d 352 (La.App. 1st Cir.1989), writ denied, 541 So.2d 1390 (La.1989); Smiciklas v. Groendyke Transport, Inc., 505 So.2d 775 (La.App. 2nd Cir.1987), writ denied, 506 So.2d 1231 (La.1987).[2]

RES IPSA LOQUITUR
The issue before us today is governed by the recent Supreme Court case of Cangelosi v. Our Lady of the Lake Regional Medical Center (No. 89-C-1093, rendered April 20, 1990). There, the court held
The standard to be used by the trial judge in determining whether it is permissible for the jury to infer negligence by the defendant under the doctrine of res ipsa loquitur in medical malpractice *1309 cases (and thus whether to instruct the jury on the doctrine) is the same standard used in other negligence cases. The trial judge must instruct the jurors on the doctrine of res ipsa loquitur unless the overall evidence, both direct and circumstantial, point so overwhelmingly in favor of the health care provider that no rational juror could find in favor of the plaintiff. If reasonable minds could reach different conclusions on the evidence, then the trial judge must give the res ipsa loquitur instruction.
Cangelosi, at footnote 12.[3]
In keeping with the Cangelosi decision, we find the trial court erred in failing to instruct the jury on the doctrine of res ipsa loquitur and should have allowed the jury to decide whether an inference of negligence was to be drawn from the evidence presented. This error, however, does not necessitate a remand and we will exercise our constitutional authority to render a judgment on the basis of an independent review of the record. Cangelosi; Mitchell.
On the basis of our review of the complete record in this case, which is summarized herein, we conclude that the evidence indicating that the injury was caused other than by the negligence of Bobby Phillips is at least as equally plausible as the evidence that it was caused by the negligence of Bobby Phillips. See Cangelosi. Fabacher has failed to prove, more probably than not, that his injury was caused by the negligence of the defendants' employee, Bobby Phillips.

JURY MISCONDUCT
At the hearing on the motion for a new trial, Fabacher asserted that he was entitled to a new trial due to the misconduct of the jury. In support thereof, he sought to introduce an affidavit from a juror which indicated that the jury seriously considered the issue of high malpractice insurance rates, and how those rates affect doctors' bills, in reaching its decision.
The general rule is that affidavits or other testimony of jurors are inadmissible to impeach their own verdict. Wright v. State Farm Mutual Auto Insurance Co., 445 So.2d 206 (La.App. 3rd Cir.1984). This case presents no circumstances which would justify deviation from that rule.[4] We find the affidavit inadmissible and therefore entitled to no weight. The trial judge properly denied Fabacher's motion for new trial.
For the foregoing reasons, the judgment of the trial court dismissing plaintiff's suit is affirmed. Costs of this appeal are assessed to plaintiff.
AFFIRMED.
NOTES
[1] Lake Charles Anesthesiology Group was incorrectly referred to in plaintiff's petition as "Laborde, McCauley & Wilson, Anesthesiologists (Cliffe C. Laborde, Jr., M.D.; C.B. McCauley, M.D.; and E.A. Wilson, M.D.)."
[2] See also Broussard v. Pennsylvania Millers Mutual Insurance Co., 398 So.2d 205 (La.App. 3rd Cir.1981), affirmed 406 So.2d 574 (La.1981) and Trahan v. Liberty Mutual Insurance Co., 273 So.2d 331 (La.App. 3rd Cir.1973), writ denied, 275 So.2d 791 (La.1973) which applied art. 1793, but commented on the merits of the issue anyway, and Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La.App. 5th Cir.1982) and Lea v. Baumann Surgical Supplies, Inc., 321 So.2d 844 (La.App. 1st Cir.1975) writ denied, 325 So.2d 279 (La.1976) which refused to discuss the merits once the right to appeal was forfeited.
[3] To the extent that Cangelosi may conflict with the 1989 decision in Montgomery v. Opelousas General Hospital, 540 So.2d 312 (La.1989), we will follow the more recent pronouncement of our Supreme Court. It appears the Montgomery decision is pertinent now only to the review of the jury's verdict in favor of a plaintiff after the jury has been instructed on res ipsa loquitur. The Montgomery language discussing the applicability of the doctrine refers to the jury's finding, not to the necessity for an instruction on the doctrine itself, which subject matter is now governed by Cangelosi.
[4] We take note of the very recent case of Wright v. Hirsch, 556 So.2d 109 (La.App. 4th Cir.1990), but find the circumstances therein inapposite to those in the case sub judice. In Wright, the appellate court reversed and remanded for a new trial on the basis of jury misconduct inasmuch as a juror reviewed independent medical information not in the record, conducted his own medical research, and actively conveyed his research to the other jurors during deliberations.